IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

PAMELA SIERCKS,                      )
                                     )
                Plaintiff,           )
                                     )
        v.                           )     Case No.
                                     )     13-4241-CV-C-REL-SSA
CAROLYN W. COLVIN, Acting            )
Commissioner of Social Security,     )
                                     )
                Defendant.           )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Pamela Siercks seeks review of the final decision of the Commissioner of Social

Security denying plaintiff's application for disability benefits under the Social Security Act

("the Act"). Plaintiff argues that the ALJ erred in (1) finding that plaintiff is capable of

performing work where her interaction with supervisors and coworkers is only superficial and

she must not be required to communicate with the general public although she can be around

the general public; (2) finding plaintiff not credible; and (3) relying on the vocational expert's

response to a hypothetical that did not accurately portray plaintiff's limitations. I find that the

substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not

disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision

of the Commissioner will be affirmed.

## I.    BACKGROUND

On June 21, 2011, plaintiff applied for disability benefits alleging that she had been

disabled since December 29, 2009. Plaintiff's disability stems from bipolar disorder and post

traumatic stress disorder. Plaintiff's application was denied on October 7, 2011. On October

22, 2012, a hearing was held before an Administrative Law Judge. On November 7, 2012, the

ALJ found that plaintiff was not under a "disability" as defined in the Act. On October 31,

2013, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

2

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.   Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.   Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.   Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.   Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

3

5.      Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert Denise Waddell, in addition to documentary evidence admitted at the hearing.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Unemployment Compensation Records

Although plaintiff applied for disability benefits on June 21, 2011, she collected unemployment compensation from June 2011 through at least August 2012 and "continuing" (Tr. at 156).

### Earnings Records

The record shows that plaintiff earned the following income from 1973 through 2011:

| Year | Earnings | Year | Earnings |
|------|---------|------|---------|
| 1973 | $ 555.10 | 1993 | $ 10,435.63 |
| 1974 | 1,307.30 | 1994 | 10,636.12 |
| 1975 | 613.33 | 1995 | 10,933.87 |
| 1976 | 1,141.76 | 1996 | 11,893.25 |
| 1977 | 1,141.76 | 1997 | 13,597.11 |
| 1978 | 852.75 | 1998 | 4,352.10 |
| 1979 | 4,439.27 | 1999 | 11,176.43 |
| 1980 | 3,920.47 | 2000 | 5,300.47 |
| 1981 | 4,014.76 | 2001 | 3,588.79 |
| 1982 | 1,696.73 | 2002 | 4,450.83 |

4

| 1983 | 2,250.35 | 2003 | 17,600.46 |
|------|----------|------|-----------|
| 1984 | 529.69 | 2004 | 10,776.95 |
| 1985 | 0.00 | 2005 | 15,189.70 |
| 1986 | 0.00 | 2006 | 12,965.77 |
| 1987 | 1,753.45 | 2007 | 16,323.65 |
| 1988 | 4,906.00 | 2008 | 14,736.69 |
| 1989 | 1,916.00 | 2009 | 16,812.10 |
| 1990 | 9,226.26 | 2010 | 1,178.16 |
| 1991 | 11,366.82 | 2011 | 2,266.88 |
| 1992 | 10,387.86 | | |

(Tr. at 164).

**Work History Report**

In a Work History Report plaintiff listed her previous employment as including the following: Assistant Manager at a restaurant and grocery store from May 2006 to December 2009, cashier at a convenience store from January 2003 to May 2007, factory worker from September 2002 to September 2003, and various positions as a waitress (Tr. at 211).

**Disability Report**

Plaintiff's caseworker from Pathways, Misty Halvorsen, completed a Disability Report for plaintiff (Tr. at 222-231). She reported that plaintiff stopped working on December 28, 2009 because "it was a seasonal job, and they didn't need her anymore." (Tr. at 224). She then went into a severe depression, she has a hard time getting out of bed daily, she does not eat much, she does not like to leave her home, and because of being out of work she has become behind in her rent. She feels anxious when she is in a crowded place. All of the mental health professionals listed in this form were doctors plaintiff planned to begin seeing --

5

she had not yet had an appointment with them (i.e., Dr. Becky Hartley, Dr. Brian Parsells). Mental health hospitalizations were reported to have occurred sometime in "1997-1998" (which was a one night stay) and 1982.

**Function Report**

On July 25, 2011, plaintiff and Misty Halvorsen completed a Function Report (Tr. at 242-249). Plaintiff reported that she spends her day watching television and she eats twice a day. She sometimes takes her dog to get the mail with her. She does not leave the house because she does not want anyone to see her. Plaintiff does not eat well-balanced meals because she does not have a stove, she only has a microwave. When plaintiff goes out of her home, she can go out alone and she drives. She shops in stores for necessities for about an hour at a time once a month. She has no problems getting along with family, friends, neighbors or others; however, she is not social at all (Tr. at 247). She can follow spoken instructions. She gets along fine with authority figures. She was fired from K4 for poor customer service.

**Function Report - Third Party**

On July 25, 2011, Misty Halvorsen completed a Function Report - Third Party which states, pretty much word for word, that which is written in plaintiff's Function Report bearing the same date (Tr. at 256-263).

**B.      SUMMARY OF TESTIMONY**

During the October 22, 2012, hearing, plaintiff testified; and Denise Waddell, a vocational expert, testified at the request of the ALJ.

**1.      Plaintiff's testimony.**

At the time of the hearing plaintiff was living alone in a low-income apartment (Tr. at 29, 43). She had been living there for a year, and before that she lived in a trailer by herself

6

(Tr. at 43). The floors of the trailer were falling in, and she got with a caseworker who arranged for her to move into an apartment (Tr. at 43). She is in a program that pays her rent (Tr. at 43). Her caseworker suggested she apply for Social Security disability benefits in June 2011 (Tr. at 43).

She last worked in December 2009 at 4K Meat and Cheese, a restaurant and store (Tr. at 29, 43). She worked as a cashier, cook and waitress (Tr. at 30). Plaintiff was unable to deal with the customers anymore -- she was unable to control her emotions (Tr. at 30). When asked to describe plaintiff's emotional condition on her job at 4K that caused her to lose her job, she testified, "A customer took a sample cup that we have of cheese, and it was empty. And I didn't stand there and explain to him, and I just took it and went to the back room with it, and one of the owners saw how I treated the customer." (Tr. at 31). When she came back after the weekend, she was asked not to come back (Tr. at 31). Plaintiff was warned about her emotions at work three times before her termination (Tr. at 32). She has never lost any other job due to her emotional condition (Tr. at 31). Her emotional difficulties have gotten worse the past couple of years (Tr. at 30).

Since she applied for disability benefits, she got a job working as a cook at a nursing home (Tr. at 44). She quit after about a month because she could not control her perspiring (Tr. at 44). She did not miss any work while she was employed there, and she drove herself to her mother's residence and from there walked to work (Tr. at 44). Plaintiff has looked for jobs since she applied for disability (Tr. at 45). She mainly looks for jobs as a cashier (Tr. at 45). When asked why she would apply for a job she claims she cannot do, plaintiff said she was just looking for "anything I could do that I had experience in" (Tr. at 45). Plaintiff worked as a waitress in her friend's bar after she applied for disability benefits, but she did not get paid and only did that to help out her friend (Tr. at 52).

7

After she was terminated from 4K in December 2009, plaintiff collected unemployment benefits for about a year (Tr. at 45). She was asked whether she told the State of Missouri that she was ready and available to work (Tr. at 46). "Yes, that's how it works. I have to apply for jobs to keep receiving unemployment." (Tr. at 46). When asked whether that was the truth, since she, under oath at this administrative hearing, testified that she had been unable to perform any job, she said, "Yes and no." (Tr. at 46). Plaintiff said she thought if she could get a job, it would help her situation and her mental outlook (Tr. at 46). Her boss at 4K worked with her so that she could draw unemployment, even though she had been fired (Tr. at 47).

Although plaintiff was not tearful during her administrative hearing, she testified that she gets nervous around authority and she wrings her hands as she was doing during the hearing (Tr. at 32). This was the kind of thing her boss was talking about when he warned her about her emotions (Tr. at 32-33). When she was working, customers being rude and asking for more than plaintiff thought they deserved triggered her nervousness (Tr. at 33).

Plaintiff worked at 4K with only her boss, and she got along with him (Tr. at 33). Whenever he reprimanded her, though, she would get teary eyed (Tr. at 33). When asked whether she would be able to get along with a boss if she had a job where she did not have to work around people, she stated that it would depend on how stressful the situation was (Tr. at 33).

In addition to being stressed about people, plaintiff gets nervous about things she does not think she can do (Tr. at 34). When asked to give an example, she was unable (Tr. at 34).

Plaintiff has had three caseworkers (Tr. at 34). She has gotten emotionally upset in front of her caseworker (Tr. at 34). Plaintiff's current caseworker has seen her twice so far and brought plaintiff to the hearing (Tr. at 34). Plaintiff has a car but she does not have a

driver's license -- she drives "very little" (Tr. at 35).  Plaintiff's car expenses are paid by

Pathways (Tr. at 45).  Pathways also pays for her utilities (Tr. at 45).

Plaintiff is supposed to be participating in group therapy once a week (Tr. at 35).  It is

very difficult for her because she has to leave her house (Tr. at 35).  Most days she does not

want to leave her house (Tr. at 35).  If plaintiff does not go to group therapy, she can be

dismissed from the program (Tr. at 36).  Plaintiff's caseworker takes her to her appointments

including to see her lawyer (Tr. at 36).  She takes plaintiff to a food pantry (Tr. at 37).  Plaintiff

goes to Wal-Mart about once a month; she does not like going there because there are too

many people so she goes late at night (Tr. at 37).  Plaintiff sees a psychiatrist, but he has not

given her any opinion about whether she is capable of working (Tr. at 37-38).

Plaintiff was taking Pristiq for depression, but it did not help (Tr. at 38).  Two days

before the hearing she was switched to Viibryd (Tr. at 38).  Despite her medication not

helping, if she does not take it she becomes suicidal (Tr. at 38).  Plaintiff was a victim of

physical and sexual abuse in the past, and she still struggles with those issues (Tr. at 39-40).

She attempted suicide by taking pills years ago (Tr. at 39).

Plaintiff is able to care for her own personal grooming only on some days (Tr. at 41).

She showers and gets ready if she has an appointment (Tr. at 41).  Plaintiff has no friends[1] and

does not socialize (Tr. at 41).  She spends her day lying in front of the television set watching

sitcoms, but she does not concentrate on the show (Tr. at 41, 42, 50).  Nobody cleans the

apartment, it is not "nice and neat" (Tr. at 41-42).  She used to read but she no longer does

(Tr. at 42).  She has problems with her memory, but was unable to give any examples (Tr. at

---

[1]Because plaintiff testified that she has no friends, the ALJ asked her, when she was
testifying about working without getting paid in her friend's bar, about her testimony that she
has no friends.  "So who are you referring to now when you say your friend?"  A: "Just a bar
owner."  Q. "But you referred to the person as your friend."  A: "Someone that I've known for
a number of years."  Q. "And you consider them to be a friend?"  A: "Yes." (Tr. at 52-53).

42). Plaintiff's mother comes over to visit about once every other week (Tr. at 47). Plaintiff has two grown children and a six-year-old grandson (Tr. at 47). She had taken care of her grandson about six months before the hearing (Tr. at 47). She was alone with him and had no difficulty taking care of him in her apartment (Tr. at 47-48). Plaintiff has a cell phone that she gets for free and she is able to text family members on that (Tr. at 49). Plaintiff is able to do her own laundry and prepare her own meals (Tr. at 50).

Plaintiff was asked to identify all the places she goes when she leaves her home (Tr. at 48). She goes to group therapy once a week, she goes to a food pantry, she goes to Wal-Mart about once a month, she goes to her mother's once every week or two, she goes to her son's occasionally, she went to a few places to apply for jobs in person, she goes to the gas station (Tr. at 49-51). Plaintiff's caseworker takes her to all of these places except she drives herself to her mother's and to the gas station (Tr. at 51). When asked to name every place she goes when she leaves her home, plaintiff did not mention leaving her home to walk around her neighborhood for exercise; and because this is noted in her Pathways records, the ALJ questioned her about this discrepancy (Tr. at 53). She testified that she has left her home to walk around the neighborhood, but it is after 10:00 at night, she is by herself, and she only goes around the block (Tr. at 53). The ALJ asked plaintiff about the Pathways records which indicate that plaintiff sits outside and talks to her neighbors (Tr. at 53-54). She testified that she does occasionally do that, and she did not know those neighbors before moving into her apartment (Tr. at 54).

## 2.    Vocational expert testimony.

Vocational expert Denise Waddell testified at the request of the Administrative Law Judge. The first hypothetical involved a person who could perform a full range of exertional work but was limited to understanding, remembering and carrying out simple instructions in a

10

routine work setting that would involve infrequent changes throughout the work day where interaction with supervisors and co-workers would be superficial in nature, and the individual could be around people but would not be required to communicate with members of the general public on behalf of the employer (Tr. at 55-56). The vocational expert testified that such a person could work as a counter supply worker, DOT 319.687-010, with 2,300 jobs in Missouri and 95,000 in the country. This job is unskilled with an SVP of 2, medium exertion (Tr. at 56). The person could work as a linen room attendant, DOT 222.387-030, with 530 jobs in Missouri and 38,900 in the country. The job is unskilled with an SVP of 2 (Tr. at 56). The person could work as an order filler, DOT 922.687-058, with 6,000 jobs in Missouri and 175,000 in the country. This job is also unskilled with an SVP of 2 (Tr. at 56).

The second hypothetical was the same as the first except the person would need to take unscheduled breaks because of becoming emotional, becoming teary eyed, and having breakdowns (Tr. at 57). The vocational expert testified that such a person could not work (Tr. at 57).

C.    *SUMMARY OF MEDICAL RECORDS*

December 29, 2009, is plaintiff's alleged onset date. There are no medical records that predate plaintiff's alleged onset date.

On March 22, 2010, plaintiff saw Jean Moore, a nurse practitioner, to establish care (Tr. at 333-336). She complained of depression and was taking no medications at the time. Plaintiff reported smoking a pack and a half of cigarettes per day and drinking alcohol occasionally. She reported a history of methamphetamine use but said she quit using it in 2002. She reported previously using Xanax before going into rehab. Plaintiff was living alone. She had just lost her job in January. Plaintiff reported helplessness, hopelessness, worthlessness, diminished interest in activities, easy fatigability, hypersomnia, suicidal

11

thoughts but no plan, and unexplained weight gain. She reported suicide attempts in the past "with meds and cutting." Plaintiff reported having had depression for several years and being treated "off and on." She reported progressively deteriorating. Despite plaintiff having reported unexplained weight gain, the medical examination part of the record shows that she denied changes in weight. The record also states that plaintiff denied fatigue and weakness, but later in the record it states that plaintiff was "fatigued." She was described as well groomed and alert but tearful. Plaintiff reported that she was not having any trouble concentrating (Tr. at 335). Her other symptoms, such as feeling depressed, having trouble sleeping, and overeating were making it "extremely difficult" for her to "do her work, take care of things at home, or get along with other people." Plaintiff was assessed with tobacco use disorder and depressive disorder. She was given prescriptions for Hydroxyzine[2] and Zoloft (treats depression). She was counseled on smoking cessation and was referred to Wilma Bradshaw, a licensed clinical social worker.

On April 21, 2010, plaintiff saw Kristie Moriarty, a licensed practical nurse, for medication refills (Tr. at 330-332). Plaintiff was smoking a pack and a half of cigarettes per day and consuming alcohol occasionally. Plaintiff reported that the Hydroxyzine was not helping and the increased dose of Zoloft "made her feel blah." Plaintiff said she was still having thoughts of suicide but had contracted with a counselor not to harm herself. Plaintiff was observed to be alert, active and well groomed. No other psychological evaluation was performed. Her condition was noted to be stable. She was assessed with tobacco use disorder and depressive disorder. Her dose of Hydroxyzine was increased, Zoloft was discontinued and Cymbalta was prescribed.

---

[2]An antihistamine used to treat anxiety, among other things.

On June 16, 2010, plaintiff saw Jean Moore, a nurse practitioner, for a follow up (Tr. at 326-329). Plaintiff said her medications were making her want to jump out of her skin. Plaintiff was smoking a pack and a half of cigarettes per day and using alcohol occasionally. Plaintiff's depression was noted to be progressively improving. "No associated symptoms noted." Plaintiff was observed to be well groomed and appropriately dressed. She did not appear anxious or withdrawn. Her speech and affect were appropriate. She was assessed with tobacco abuse disorder, recurrent depression - severe, depressive disorder, and anxiety state not otherwise specified. Plaintiff had not been taking Hydroxyzine so that medication was discontinued and Abilify was prescribed.

On June 28, 2010, plaintiff saw Jean Moore, a nurse practitioner, about a hernia (Tr. at 300). Plaintiff was described as pleasant. She reported smoking a pack and a half of cigarettes per day.

On July 15, 2010, plaintiff saw Jean Moore, a nurse practitioner, about a hernia (Tr. at 305). Plaintiff was described as pleasant and continued to smoke one and a half packs of cigarettes per day.

On September 21, 2010, plaintiff saw Jean Moore, a nurse practitioner, for medication refills (Tr. at 323-325). Plaintiff was smoking a pack and a half of cigarettes per day and reported drinking alcohol occasionally. The record indicates that plaintiff's depressive symptoms were "increasing in severity over time" although "no associated symptoms noted." Plaintiff reported that her symptoms were relieved with Cymbalta. Plaintiff was observed to be well groomed with adequate hygiene. Gait and posture were normal. She was described as congenial, pleasant and cooperative. She was making normal eye contact. "Patient seems to be depressed. She is sad and despairing." Plaintiff denied suicidal ideation. She was assessed

13

with recurrent depression - severe. Cymbalta was discontinued and Effexor was prescribed. Her condition was noted to be stable.

On October 19, 2010, plaintiff saw Jean Moore, a nurse practitioner, for a follow up (Tr. at 320-322). Plaintiff had been taking Effexor, and she was there for a "new medication review." Plaintiff reported that she was "doing well on new medicine." She was smoking a pack and a half of cigarettes per day and she reported drinking alcohol occasionally. Plaintiff's depression was noted to be progressively improving. On exam plaintiff showed no evidence of anxiety, depression, sleep disturbance, irritability, or mood swings and she denied suicidal thoughts or ideation. Plaintiff was observed to be alert and active, well groomed, in no acute distress. She was assessed with recurrent depression. Plaintiff reported that her doctor had taken her off Abilify. Ms. Moore noted that plaintiff's condition was stable. She was told to "continue all medications" (although no medications were identified) and to follow up in three months.

On December 20, 2010, plaintiff saw Jean Moore, a nurse practitioner, about a hernia (Tr. at 298). She was smoking a pack and a half of cigarettes per day.

On January 14, 2011, plaintiff saw Jean Moore, a nurse practitioner, complaining of depression (Tr. at 317-319). Plaintiff reported smoking a pack and a half of cigarettes per day and drinking alcohol occasionally. She had a history of methamphetamine use but stopped that eight years earlier. "Condition of the patient is progressively improving. No associated symptoms noted. No relieving factors for depression are known. There are no known precipitating or aggravating factors for depression. She is not suffering from any medical disorder. " Plaintiff was observed to be alert and active. She was well groomed and in no acute distress. She was assessed with tobacco use disorder, recurrent depression, and anxiety state not otherwise specified, although no anxiety was observed by Ms. Moore. Plaintiff's status

14

was listed as stable. Her Effexor was increased from 37.5 mg to 75 mg twice a day, and she was told to return in ten months or sooner if needed.

On April 12, 2011, plaintiff saw Jean Moore, a nurse practitioner, complaining of depression, lack of energy, low self esteem and fatigue (Tr. at 313-316). Plaintiff said she did not want to leave her home. She was taking Effexor. Plaintiff reported drinking alcohol occasionally. She reported a history of methamphetamine use with her last use being eight years earlier. She was consuming two cups of coffee and four caffeinated sodas per day. She reported suicidal ideation but no plan and said her condition was progressively deteriorating. "There are no known precipitating or aggravating factors for depression. She is not suffering from any medical disorder." Plaintiff was observed to be alert and active, well groomed with satisfactory hygiene and self care, she was appropriately dressed, gait and posture were normal, no involuntary movements were noted, no other abnormalities were observed. Plaintiff was presented with a list of symptoms and reported that she had experienced all of these symptoms nearly every day with the exception of moving or speaking very slowly or being very fidgety. She reported that her mental symptoms had made it "extremely difficult" for her to do her work, take care of things at home or get along with other people. Plaintiff's condition was listed as "stable" and her dose of Effexor was increased to 150 mg twice a day. She was told to return if needed.

On May 5, 2011, plaintiff had an initial intake assessment done by Brandy Baker, M.S., at Pathways Community Behavioral Healthcare (Tr. at 423-429). Clinical conditions that "may be a focus of clinical attention" were major depressive disorder, social phobia, and post traumatic stress disorder. Plaintiff reported severe depression on a daily basis and said she experienced panic attacks and ringing in her ears "when out in public such as applying for a job and in groups larger than 2-3 people." Plaintiff reported mild difficulty concentrating.

15

Based on this initial intake assessment, Ms. Baker found that plaintiff "is impaired in all daily living areas."

On May 9, 2011, plaintiff was seen at Pathways Community Behavioral Healthcare by Brandy Baker, M.S. (Tr. at 401-422). She was not at that time receiving any mental health treatment although she was taking Effexor. She completed a Functional Skills Evaluation in which she reported no difficulty with grooming or hygiene; maintaining clean and appropriate clothing; caring for her nutritional needs; cooking; handling correspondence, paperwork, and appointments; shopping; driving; using the telephone; or using a post office. Plaintiff reported having no friends and said her "social phobia keeps her from getting out in public and interacting with people." She said she does have difficulty caring for her own medical needs because, "Due to major depression, [she] tends to withdraw and experiences social phobia and panic attacks so she tends to ignore her medical needs and avoids going out into public." Plaintiff said she was afraid to leave her home, she didn't have any money, and she would sleep a lot. She tended to "hide in the kitchen at family functions to avoid group settings." She also reported needing help with financial management because she had no income and was not receiving disability income. Plaintiff reported difficulties with maintaining a residence because she needed help paying rent and keeping her home clean. "Client reports that due to only being able to afford to rent a 'dump', the place is so bad that it's useless to try to clean or fix it up." Plaintiff said she is capable of maintaining a clean home but keeping her own home clean was a waste of time and energy because the place was "so bad." Plaintiff reported having experienced significant difficulties in her interactions with neighbors, strangers, passersby, clerks, landlords, employers and coworkers. She could not describe her difficulties with the first five groups of people but said that her social phobia and panic attacks interfered with going out in public. With respect to employers and coworkers, plaintiff said she "wants to

16

return to the workforce but her increased symptoms of depression, social phobia and anxiety keep her from doing so." Plaintiff reported no trouble getting along with law enforcement or other officials. Plaintiff was noted to be intelligent and capable of making decisions, "but her low self-esteem interferes with such." She said that her increased anxiety/social phobia and depression interfered with her ability to handle change in routine. Increased symptoms of depression and anxiety coupled with low self-esteem prevented her from applying for jobs or working. Plaintiff reported suffering from panic attacks and ringing in her ears when she was "out in public such as applying for a job and in groups larger than 2-3 people."

Plaintiff reported two previous psychiatric hospitalizations. The first was from 1999 to 2000 when she was involuntarily hospitalized for substance abuse. The treatment was not completed. "Client was kicked out for being too co-dependent and was sent to Columbia." The second hospitalization was in 2000 when plaintiff was again involuntarily hospitalized for substance abuse. She had been court-ordered to participate in inpatient treatment. Plaintiff reported being compliant with treatment but said it was not a positive experience and she did not feel like she improved. Plaintiff was on probation from 1998 through 2002 for methamphetamine. Plaintiff reported having thought about suicide the previous week but "denies any actual plans or attempts at ending her life." Plaintiff was noted to be "a recovering meth user." She was 37 when she first used methamphetamine. Plaintiff reported sexual/physical/verbal abuse by her ex-husband and ex-boyfriend and verbal/emotional abuse by her biological father. Other than this abuse by her father, plaintiff's childhood and adolescence were normal. Plaintiff reported a positive relationship with her parents and siblings. Plaintiff reported having worked as a waitress/bartender from May 9, 2000, through January 9, 2010. Plaintiff's unemployment benefits had run out and she was getting food

stamps but had a "very limited income." Her goals were listed as, "I want to get a job.  I want to lose weight."  It was determined that plaintiff qualified for services at Pathways.

On June 20, 2011, plaintiff saw Jean Moore, a nurse practitioner, for low back and knee pain (Tr. at 310-312).  Plaintiff also reported "feeling like her heart is beating very fast at times and states it takes her breath away.  Pt states it happens 2-3 times a week."  She described this palpitation as lasting for a few seconds (Tr. at 311).  Plaintiff reported smoking a pack and a half of cigarettes per day and drinking alcohol occasionally.  She reported a history of methamphetamine use with her last use being eight years earlier.  She was consuming two cups of coffee and four caffeinated sodas per day.  Plaintiff was described as alert, active, well groomed, and in no acute distress.  "Appropriately dressed.  Does not appear anxious or withdrawn.  Speech and affect are appropriate."  Plaintiff's cardiac exam was normal.  No treatment was provided and no recommendations were made.

On July 5, 2011, plaintiff saw Brian Parsells, D.O., for a psychiatric initial evaluation (Tr. at 430-431).  Plaintiff had lived alone for the past nine years.  She was receiving unemployment benefits which had begun in December 2009.  Plaintiff was on Medicaid.  Her chief complaint was, "I don't want to live anymore."  Plaintiff said she lost her job because "business was slow and they didn't think I was nice enough to the customers."  Plaintiff was taking Effexor.  Plaintiff had started treatment with Pathways in 1997 for a "meth problem." She said she was hospitalized at Mid Mo for two weeks at age 26 for cutting her wrist and was hospitalized in Sedalia in the stress unit in her 40s but could not remember why she had been there.  Plaintiff had held 12 to 15 jobs and said her best job was waitress work.  She had a Class C Felony conviction for possession of methamphetamine in 1998 with no prison time.  Plaintiff reported that in the late 1980s her former husband pulled a gun on her and choked her until she passed out.  She received no medical treatment after that incident. She was raped, beaten

18

and kicked by a boyfriend. She said the television would trigger a flashback a couple times a month. Plaintiff began smoking at age 15 and was smoking a pack and a half of cigarettes per day. She had not had an alcoholic drink for the past eight or nine months. Plaintiff began using methamphetamine in the early 1990s and "last used 6/2010" [this is six months after plaintiff's alleged onset date]. Dr. Parsells described plaintiff as having an attractive appearance and casually dressed but "cries easily." He assessed amphetamine dependence, in early partial remission; post traumatic stress disorder, chronic; bipolar II disorder, depressed type. He prescribed Seroquel (treats schizophrenia, bipolar disorder and depression).

On July 6, 2011, plaintiff saw Becky Hartley, Psy.D., for individual therapy (Tr. at 399-400). Plaintiff arrived on time, was appropriately dressed, and was observed to have good hygiene and grooming. Plaintiff was oriented times four; her mood and affect were normal and congruent; her speech was normal; her thinking was logical, coherent and sequential; she appeared to function in the average range of cognitive and intellectual functioning; her eye contact was adequate; she was engaged throughout the session without any unusual mannerisms or behaviors; she denied suicidal ideation; recent and remote memories were intact. The only abnormal observation was that plaintiff "appeared depressed." Plaintiff was asked why she was there, and she said, "I don't like myself." She said she had held a job for four years and was recently laid off, and she had had a job as a cook in a nursing home but quit after a month because it was too stressful. Plaintiff reported that after being laid off from her long-term job, she became very depressed. Plaintiff said she had been depressed all of her life. Dr. Hartley described plaintiff as "very insightful."

On August 23, 2011, plaintiff saw Jean Moore, a nurse practitioner, for medical refills (Tr. at 367-370). "Pt states Dr. Parsells is taking over the rx on the Effexor." Plaintiff was

observed to be alert, active, and well groomed. No mental symptoms were observed; no mental diagnoses were made.

On September 15, 2011, Stanley Hutson, Ph.D., completed a Psychiatric Review Technique; however, he did not make any findings with regard to plaintiff's mental limitations (Tr. at 349-359). He did include a long list of "consultant's notes" which concluded with, "Her allegations are mostly credible. She has severe mental disorders that do not meet or equate a listing." He also submitted a Mental Residual Functional Capacity assessment which was not completed; however, he wrote, "She has the ability to understand and remember instructions, remember work procedures, and make work decisions. She has social avoidance which impacts her concentration and persistence, work attendance, and adaptation to work. She can be appropriate in most social interactions, and she is capable of coping with a work setting that has few social demands."

On September 20, 2011, plaintiff saw Patty Garcia, a nurse practitioner, for a follow up on diabetes and high cholesterol (Tr. at 364-366, 483-485). Plaintiff continued to smoke a pack and a half of cigarettes per day and drink alcohol occasionally. Plaintiff was assessed with tobacco use disorder. No mental symptoms were noted; no mental diagnoses were made.

On October 7, 2011, plaintiff's application for disability benefits was denied initially.

On December 2, 2011, plaintiff saw Jean Moore, a nurse practitioner, to review lab results (Tr. at 479-482). Plaintiff was described as alert, active, well groomed, appropriately dressed. "Does not appear anxious or withdrawn. Speech and affect are appropriate."

On January 31, 2012, plaintiff saw Jean Moore, a nurse practitioner (Tr. at 475-478). Plaintiff complained of a cough and congestion with shortness of air. Plaintiff continued to smoke, and she reported that smoking made her coughing worse. Plaintiff was observed to be alert and active, well groomed, appropriately dressed. "Does not appear anxious or

withdrawn. Speech and affect are appropriate." Plaintiff was treated with a nebulizer using Albuterol and her symptoms improved. She was assessed with acute bronchitis, sinus infection, and tobacco use disorder.

On March 8, 2012, plaintiff saw Jean Moore, a nurse practitioner, for medication refills (Tr. at 471-474). Plaintiff continued to smoke a pack and a half of cigarettes per day. "Patient states that despite illness, she is able to perform activities of daily living and to work. She is not anxious, depressed or frustrated. Patient denies depression, anxiety or other psychiatric problems. A review of all the systems reveals no obvious abnormality." Plaintiff was observed to be well groomed, alert and active. "She does not appear anxious or withdrawn. Speech and affect are appropriate." No mental diagnoses were made. All of her medications were refilled.

On June 6, 2012, plaintiff saw caseworker Heather Buehler (Tr. at 440-441). Plaintiff was noted to be dressed appropriately with good hygiene. Her mood was quiet. Ms. Buehler talked to plaintiff about walking, doing aerobics, and swimming for exercise. "Pam stated that she has been getting out of her apartment and going to work for a couple of days on the weekend, this week it was Sunday and Monday. Pam stated that she didn't work Friday and Saturday nights because there wasn't any business and she wasn't needed. Pam stated that she is a little worried about money this month as her allowance from SCL funding was cut down due to overpayment. Pam stated that she needs to go to the food pantry tomorrow and may need help with gas getting there. Pam stated that she has been walking at night to avoid the heat. Pam stated that she got paperwork from Social Security Administration concerning the steps to begin her appeal case. Pam stated that she hasn't called any lawyers just yet but will make sure to call them this week and find out if she can get a lawyer set up soon. Pam stated that she has been taking her medications and feels the depression is getting better."

On June 7, 2012, plaintiff saw caseworker Heather Buehler (Tr. at 442-443). Plaintiff was noted to be appropriately dressed with good hygiene. She was in a "pleasant but quiet mood." Ms. Buehler helped plaintiff with her Social Security disability paperwork. "Pam stated that she was doing about the same but was willing to get out of the house today and go to the food pantry. Pam stated that she appreciates the ride from CSS to go into town so she can conserve gas in her car as she got paid less from her utility allowance than she was supposed to." Plaintiff said her son was planning to come over to help her look over her Social Security paperwork which was on a disc and she did not have a computer. Plaintiff said she had not really left her home other than "to go to work in Cole Camp and then comes straight home." Plaintiff said she was "trying to walk every night when it's cooler."

On June 11, 2012, plaintiff saw caseworker Heather Buehler (Tr. at 444). Plaintiff was dressed appropriately with good hygiene. Her mood was quiet. "Pam stated that she was doing alright and has been watching her son's dog the past couple of days. Pam stated that her daughter-in-law looked over her Social Security paperwork and helped her do some of the paperwork needed for her upcoming hearing." Plaintiff said she was nervous to go talk to her lawyer for fear she would break down and start crying. Plaintiff said she had been sitting outside and talking with her neighbors.

On June 14, 2012, plaintiff saw caseworker Heather Buehler (Tr. at 445-446). Plaintiff was appropriately dressed with good hygiene. She was in a nervous mood. Ms. Buehler took plaintiff to see her lawyer. Plaintiff said she was nervous about talking to the lawyer, that she gets nervous about talking to people she doesn't know. Plaintiff continued to watch her son's dog while he was on vacation. She said she would not mind having a pet but she could not afford one right now. "Pam stated that she hasn't been getting out much at all and feels that her symptoms are getting worse. Pam stated that she has a hard time talking with her

neighbors at times and sits inside most of the time.  Pam stated that she didn't work over the weekend as she wasn't needed."

On June 18, 2012, plaintiff saw caseworker Heather Buehler (Tr. at 447-448).  Plaintiff was dressed appropriately with good hygiene and was in a quiet mood.  Ms. Buehler educated plaintiff on various exercise plans to help decrease her depressive symptoms.  Plaintiff said she was lonely since her son picked up his dog.  "Pam stated that she tries to get out of her apartment and talk with her neighbors from time to time but has a hard time sitting outside due to the weather being so hot.  Pam stated that she hasn't been walking at night but needs to get the motivation to get up and go.  Pam stated that she would be willing to walk with CSS [her caseworker] at the community center a couple times a week."  Plaintiff said she did not like getting out in the community for fear people would judge her appearance -- she said she had gained weight[3] and was afraid people would talk about her.  "Pam stated that she didn't get to work again this weekend as there wasn't any business since two other places had bands.  Pam stated that she gets frustrated when she can't work to make extra money.  Pam stated that she has talked with a couple of places in Lincoln about work and can't find anywhere to work full time."

On July 2, 2012, plaintiff saw caseworker Heather Buehler (Tr. at 449-450).  Plaintiff was dressed appropriately and her hygiene was good.  Plaintiff reported not doing as well because she was upset with her son and daughter-in-law for not making time to see her.  Plaintiff had gotten jealous because they had stopped in to visit her daughter-in-law's mother but had not come to see plaintiff.  "Pam stated that she is trying to keep herself busy with working and staying in her apartment.  Pam stated that she didn't work last weekend as she didn't have the gas money to get to Cole Camp but wasn't needed anyway.  Pam stated that she

_____

[3]Plaintiff weighed approximately 200 pounds at the time (Tr. at 453).

feels her medications aren't working as well as they were before, as she has been getting angry and depressed about different things including her financial [situation] and Social Security case."

On July 9, 2012, plaintiff saw caseworker Heather Buehler (Tr. at 451-452). Plaintiff discussed issues going on with her extended family. She said that she has a hard time being around a lot of people but is willing to try.

On July 10, 2012, plaintiff saw Brian Parsells, D.O. (Tr. at 453-454). Plaintiff was tearful during her appointment and said her medication was no longer working. She said that she stays in bed, cries, and is very unhappy -- "this has been slowly building up over the last 2 to 3 wks now." Plaintiff said she would fall asleep while watching television about twice a day. Dr. Parsells observed that plaintiff was "nicely dressed and groomed." She had a sad affect with crying. Plaintiff said she felt like dying was an easy way out, and "it's mainly when I don't see my kids very often, wonder if they even care if I was around or not." He assessed amphetamine dependence, in full remission; post traumatic stress disorder, chronic; and bipolar II disorder, depressed type. He ordered lab work, he referred her for a sleep evaluation, he gave her samples of Latuda for depression and to help with sleep, and he recommended she get a therapist.

On July 17, 2012, plaintiff saw Jean Moore, a nurse practitioner (Tr. at 467-470). Plaintiff complained of a headache and vomiting. The headache had been present for two weeks. Plaintiff continued to smoke a pack and a half of cigarettes per day. She was described as alert and active, well groomed, and in no acute distress. "Does not appear anxious or withdrawn. Speech and affect are appropriate." Plaintiff reported having no trouble concentrating, but she did report feeling down and tired. Ms. Moore assessed classical

24

migraine. She provided plaintiff with information about diet and exercise, she prescribed Maxalt to be taken at the onset of a headache, and she recommended a CT of plaintiff's brain.

On July 23, 2012, plaintiff saw caseworker Heather Buehler (Tr. at 455-456). Plaintiff was dressed appropriately and her hygiene was good, she was in a quiet mood. Ms. Buehler encouraged plaintiff to apply for volunteer jobs within the community. Plaintiff had finally heard from her younger son who had said hateful things to her on the phone. "Pam stated that she has been stressed out over her finances, as she had overdraft charges from a bounced check and online payment for her utilities. Pam stated that she talked with her older son and he gave her $100.00 to cover her negative balance in her checking account. Pam stated that she hasn't been working the past couple of weekends as she hasn't been needed. Pam stated that she plans to go to the thrift store in Lincoln to put applications in for volunteer work." Plaintiff said she did not think her medications were working and that she planned to talk to her doctor about that.

On July 24, 2012, plaintiff saw Brian Parsells, D.O. (Tr. at 457-458). Plaintiff said she went to the emergency room the previous week because she thought she was having a stroke. They discontinued her Latuda. She had only taken it twice and it caused nausea, vomiting and headache. Dr. Parsells noted that plaintiff was nicely dressed and groomed. He assessed amphetamine dependence, in full remission; post traumatic stress disorder, chronic; and bipolar II disorder, depressed type. He continued her on her same medications minus Latuda.

On July 30, 2012, plaintiff saw caseworker Heather Buehler (Tr. at 459-460). Plaintiff was dressed appropriately and her hygiene was good. She was upset. Plaintiff said she felt bad when she lashed out at her sons for not calling her on a daily basis. She reported not being able to remember the last time she was truly happy. Plaintiff was taking her medications as

25

prescribed. She stated that "she feels that talking with an outpatient therapist may help her learn to let go of her past indiscretions."

On August 6, 2012, plaintiff saw caseworker Heather Buehler (Tr. at 461-462). Plaintiff was dressed appropriately and her hygiene was good. She was in a pleasant but quiet mood. Plaintiff reported that PSR groups were helping her "and she has the opportunity to socialize with people her age." Plaintiff reported getting out and walking when the weather wasn't so warm "but tries to go at night." Plaintiff had made plans to keep her grandson for a few days. Plaintiff had been spending time with her brother and helping him move. Ms. Buehler encouraged plaintiff to follow up on her disability case.

On August 13, 2012, plaintiff saw caseworker Heather Buehler (Tr. at 463-464). Plaintiff was dressed appropriately, her hygiene was good, and her mood was pleasant. Plaintiff said she had worked this past weekend but didn't make any money. "Pam stated that she needs to find a job that will pay her pretty well so she doesn't have to worry about how she is going to pay her bills. Pam stated that she has very little money after she paid all of her bills this month. Pam stated that she might be babysitting her grandson this weekend and is pretty excited about that. Pam stated that she went to visit her mother over the weekend to get out of the house. Pam stated that her mother was going to be giving her money to get her car registered by the end of the month. . . . Pam stated that she appreciates everything her family does for her but feels worthless knowing that she has to get help from them."

On August 28, 2012, plaintiff saw Brian Parsells, D.O. (Tr. at 465-466). "More better days than bad days -- my mind seems to [be] better, not as gloomy and sad as I was before all the time." Plaintiff estimated that she was 40% better. She was stressed about her upcoming disability hearing and the fact that Medicaid would not pay for a CT of her head. Plaintiff was described as nicely dressed and groomed. Dr. Parsells assessed amphetamine dependence in

26

full remission; post traumatic stress disorder, chronic; and bipolar II disorder, depressed type. He continued her psychiatric medications.

On August 28, 2012, caseworker Heather Buehler completed a Wellness Plan Review (Tr. at 438-439). Plaintiff had been accessing the community resources at least twice a week and had been attending PSR groups "as they are offered. . . . Pam has been utilizing relaxation techniques including watching tv". Plaintiff was noted to be continuing to work on her disability case with her lawyer in Sedalia and had an upcoming hearing date in October 2012. She was working odd jobs "including waitressing" to help with her finances. Pam continues to access the community on a weekly basis but has not attempted to fill out job applications." She was noted to go walking around her neighborhood to get exercise.

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Dennis LaBlanc entered his opinion on November 7, 2012 (Tr. at 8-18). Plaintiff's last insured date is September 30, 2015 (Tr. at 10).

Step one. Although plaintiff worked after her alleged onset date, her earnings did not amount to substantial gainful activity (Tr. at 10).

Step two. Plaintiff's bipolar disorder and post traumatic stress disorder are severe impairments (Tr. at 10). Plaintiff's previously alleged back and knee impairments are not severe (Tr. at 11).

Step three. Plaintiff's severe impairments do not meet or equal a listed impairment (Tr. at 11-12).

Step four. Plaintiff retains the residual functional capacity to perform a full level of work at all exertional levels but is limited to understanding, remembering and carrying out only simple instructions in a routine work setting that would involve infrequent changes through the work day. Her interaction with supervisors and coworkers must be superficial in

27

nature.  She can be around the public but must not be required to communicate with members of the general public on behalf of the employer (Tr. at 13).  Plaintiff has no past relevant work (Tr. at 17).

Step five.  Plaintiff is capable of performing jobs available in significant numbers such as counter supply worker, linen room attendant, and order filler (Tr. at 17).  Therefore, plaintiff is not disabled (Tr. at 18).

## VI.   CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible because (1) the evidence does not establish that she had a "robust" social life, (2) she testified that she was not an expert in unemployment compensation, and (3) the jobs she performed after her alleged onset date did not rise to the level of substantial gainful activity.

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints.  Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions.  Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence.  Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ.  In determining

Case 2:13-cv-04241-REL   Document 16   Filed 12/18/14   Page 28 of 39

credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

Here, the ALJ found that plaintiff retained the residual functional capacity to perform work at all exertional levels but was limited to understanding, remembering and carrying out simple instructions in a routine work setting that would involve infrequent changes throughout the work day where interaction with supervisors and co-workers would be superficial in nature, and plaintiff would not be required to communicate with members of the general public on behalf of the employer. The vocational expert testified that such a person would be able to engage in substantial gainful activity. Only with the added restriction that the person would need to take unscheduled breaks because of becoming emotional, becoming teary eyed, and having breakdowns did the vocational expert testify that no work would be available. Therefore, if plaintiff's testimony is consistent with the residual functional capacity as assessed by the ALJ, then even if she had been found fully credible, she still would not have been found disabled. The question is whether plaintiff testified that she would need unscheduled breaks and if so whether that testimony is credible.

29

Plaintiff testified that she lost her job at 4K because she took a sample cup to the back room instead of explaining to the customer what she was doing. Her customer service was poor because customers wanted more than she thought they deserved. She testified that she has never lost any other job due to her emotional condition. Plaintiff testified that before her termination from 4K, rude customers would trigger her "emotional difficulties" (Tr. at 33). She testified that she was fired from K4 for being unable to control her emotions (Tr. at 30) but in her Function Report she stated that she was fired for poor customer service (Tr. at 248). She testified that she got teary-eyed at work when she was being reprimanded by her boss (Tr. at 33). She did not testify that she needed to take unscheduled breaks while at work; she did not testify that she had breakdowns at work. Her only testimony about becoming teary-eyed at work dealt with her becoming teary-eyed when she was being reprimanded, not when dealing with customers.

When asked whether she could get along with a boss if she had a job where she did not work around people, she said it would depend on how stressful the situation was, but she was unable to give any examples of anything that would cause her too much stress (Tr. at 33-34). She testified that she gets nervous around authority figures (Tr. at 32) (yet in her Function Report she stated that she gets along fine with authority figures (Tr. at 248)).

There is nothing in plaintiff's testimony that is inconsistent with the residual functional capacity assessment. The ALJ found that plaintiff was limited to understanding, remembering and carrying out simple instructions in a routine work setting that would involve infrequent changes throughout the work day. This is consistent with her testimony that she could get along with a boss if the situation were not too stressful. The ALJ found that plaintiff was limited to only superficial interaction with supervisors and co-workers and no communication with members of the general public on behalf of the employer. This is consistent with

30

plaintiff's testimony that waiting on demanding customers triggers her emotional difficulties. Therefore, even if the ALJ had found plaintiff's testimony credible, she would still be found not disabled because her testimony is consistent with the ability to perform the jobs described by the vocational expert.

In addition to the above, I find that the evidence supports the ALJ's decision to discredit plaintiff's testimony that she is unable to work due to her impairments. She testified that she drives despite not having a driver's license; and when she was working at a nursing home, she drove to her mother's house and then walked the rest of the way to her job (Tr. at 35, 44-55). She testified that she received unemployment compensation for a long time after she lost her job at 4K. Although she argues in her brief that she is not an expert on unemployment compensation rules, the testimony at the hearing establishes that she knew collecting unemployment benefits required that she be "ready and available to work." She also acknowledged that when she told the State of Missouri that she was ready and available to work, that was not entirely truthful, because it was inconsistent with her testimony under oath at the disability hearing (Tr. at 46) but she needed the money. She also acknowledged that despite being ineligible to receive unemployment benefits due to having been fired, her boss worked with her so that she could get around that requirement, despite the fact that "working with her" on this required her employer to lie to the State of Missouri. There was no testimony that plaintiff did not understand that this was going on. The only testimony regarding her lack of understanding with respect to unemployment benefits came from the following question by her attorney after all of the above testimony:

Q.    When you were applying for and receiving unemployment it wasn't your intention to cheat the state, was it?

A.    Not at all.

31

Q.      And you're not an expert on how all that works, are you?

A.      Not at all.

(Tr. at 50-51).

Despite claiming to be completely disabled from any job due to her emotional condition, plaintiff continued to look for work as a cashier -- which necessarily requires constant contact with the public -- after her alleged onset date.  She worked as a cook at a nursing home after her alleged onset date.  She quit that job because she said she perspired too much, not because of having breakdowns or needing unscheduled breaks at work (Tr. at 44).  In fact she testified that she never missed any work while she was at that job.  She worked as a waitress in a friend's bar -- again, requiring constant contact with the public -- after her alleged onset date.  When asked about the inconsistency between performing these jobs with constant public contact during a time when she claims to be totally disabled due to an inability to be around people, plaintiff testified that she needed the money.  The fact that plaintiff would (1) drive illegally, (2) be untruthful when applying for unemployment compensation after having been fired, (3) collect unemployment compensation after having applied for disability benefits, knowing that she was therefore simultaneously claiming to the State of Missouri that she was willing and able to work while claiming to the Social Security Administration that she was unable to perform any job at all, and (4) work part time in jobs requiring constant contact with the public and apply for jobs that require constant contact with the public, all supports the ALJ's finding that plaintiff is not entirely credible in that she will do or say what needs to be done or said in order to get the things she needs.

A claim for unemployment benefits, which entails an assertion of the ability to work, is facially inconsistent with a claim of disability.  Smith v Colvin, 756 F.3d 621, 626 (8th Cir.

32

2014); <u>Paschal v. Astrue</u>, 372 Fed. Appx. 687 (8th Cir. 2010); <u>Cox v. Apfel</u>, 160 F.3d 1203, 1208 (8th Cir. 1998).

Plaintiff's other arguments with respect to the ALJ's credibility analysis are without merit. She argues that socializing with family members, walking around the neighborhood for exercise, sitting outside and talking to her neighbors, caring for a dog and her grandchild, doing household chores, working part time as a cook, and working part-time in a bar are not relevant because they do not necessarily show that she could do these things eight hours a day, five days a week.

The records in this case actually show that plaintiff's main problems were lack of money and a strained relationship with her sons. The observations of her treatment providers were almost exclusively normal:

On March 22, 2010, plaintiff reported no trouble with concentration. On June 16, 2010, she was well groomed and did not appear anxious or withdrawn, her speech and affect were appropriate. On June 28, 2010, plaintiff was described as pleasant. On July 15, 2010, plaintiff was described as pleasant. On September 21, 2010, plaintiff said her symptoms were relieved with Cymbalta. She was observed to be well groomed with adequate hygiene, normal gait and posture. She was described as congenial, pleasant and cooperative. She was making normal eye contact. On October 19, 2010, plaintiff said she was doing well on her new medication. She showed no evidence of anxiety, depression, irritability, or mood swings. She was well groomed.

On January 14, 2011, plaintiff was well groomed. On April 12, 2011, she was well groomed with normal hygiene, normal gait and posture, and no abnormalities were noted. Despite plaintiff reporting that her mental symptoms were making it very difficult for her to do her work, take care of things at home or get along with other people, her condition was listed

33

as stable.  On May 5, 2011, she reported only mild difficulty concentrating.  On May 9, 2011, plaintiff reported no difficulty with grooming or hygiene during a Pathways Community Behavioral Healthcare appointment.  On June 20, 2011, plaintiff was well groomed, did not appear anxious or withdrawn, and her speech and affect were normal.  On July 5, 2011, plaintiff was described as having an attractive appearance.  On July 6, 2011, she had good hygiene and grooming; her mood and affect were normal; speech was normal; thinking was logical, coherent and sequential; eye contact was adequate; she was engaged throughout the session; she denied suicidal ideation; and recent and remote memories were intact.  On August 23, 2011, she was well groomed and no mental symptoms were observed.  On September 20, 2011, no mental symptoms were observed.  On December 2, 2011, she was well groomed, she did not appear anxious or withdrawn, and speech and affect were normal.

On January 31, 2012, she was well groomed, she did not appear anxious or withdrawn, and speech and affect were appropriate.  On March 8, 2012, plaintiff said she was able to perform activities of daily living and to work.  "She is not anxious, depressed or frustrated.  Patient denies depression, anxiety or other psychiatric problems.  A review of all the systems reveals no obvious abnormality."  Plaintiff was well groomed.  She did not appear anxious or withdrawn.  Speech and affect were normal.  On June 6, 2012, she had good hygiene.  She said she had been walking at night due to the heat, not due to avoiding people.  Plaintiff said she felt her depression was getting better.  On June 7, 2012, she had good hygiene and was pleasant but quiet.  On June 11, 2012, she had good hygiene and said she had been sitting outside talking to her neighbors.  On June 14, 2010, she had good hygiene.  On that day her caseworker took her to a meeting with her lawyer.  She said she gets nervous when she has to talk to people she doesn't know.  On June 18, 2012, she had good hygiene.  Plaintiff said she tries to sit outside and talk with her neighbors but she has a hard time doing this because it was

so hot outside. Plaintiff said she would be willing to go walking at the community center (a place where other people will be present) a couple times a week. Plaintiff expressed her frustration at not being able to find full-time work. On July 2, 2012, she had good hygiene. Plaintiff reported getting angry and depressed about her lack of finances and her Social Security case.

On July 10, 2012, she was observed to be nicely dressed and groomed but tearful. She reported being very unhappy, crying and staying in bed. She expressed her sadness over not seeing her children very often and wondering if they cared about her. Her doctor recommended therapy. On July 17, 2012, she was well groomed, she did not appear anxious or withdrawn, and speech and affect were normal. Plaintiff reported having no trouble concentrating but she felt down and tired. On July 23, 2012, she had good hygiene. Plaintiff had had a hurtful conversation with one son and had been required to take money from her other son to help cover her overdrafts. She said she was planning to apply for a volunteer position in a thrift store. On July 24, 2012, she was nicely dressed and groomed. On July 30, 2012, she had good hygiene. Plaintiff was upset about her sons not calling her often enough. She indicated she might get a therapist. On August 6, 2012, her hygiene was good, mood was pleasant. On August 13, 2012, her hygiene was good, mood was pleasant. She had worked the weekend before but was disappointed about not making enough money to pay her bills. She felt worthless having to get financial help from her mother and son. On August 28, 2012, she said she was not as gloomy and sad but was stressed about her upcoming disability hearing. She was nicely dressed and groomed.

The only mention of flashbacks occurred on July 5, 2011, when plaintiff said the television would trigger a flashback a couple times a month. Yet plaintiff testified that she spends most of her day watching television. She never reported breakdowns to any medical

provider or caseworker. Plaintiff complained constantly of her financial problems, yet she smoked a pack and a half of cigarettes per day during the duration of this record -- a very expensive habit. Finally, plaintiff's medical records show that she used methamphetamine as recently as June 2010, which is six months after her alleged onset date.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's subjective complaints of disabling symptoms are not entirely credible. I further find that because her testimony is consistent with the ALJ's residual functional capacity assessment, a finding that her allegations are credible would not result in a finding that she is disabled from any job available in significant numbers in the regional or national economy.

## VII.    RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ erred in assessing plaintiff's residual functional capacity because no treating psychiatrist or psychologist provided an opinion regarding plaintiff's ability to work.

A claimant's residual functional capacity is the most that person can do despite her limitations. Toland v. Colvin, 761 F.3d 931, 935 (8th Cir. 2014); 20 C.F.R. §§ 404.1545(a) and 416.945(a). It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's residual functional capacity. Baldwin v Barnhart, 349 F.3d 549, 556 (8th Cir. 2003) (citing Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001)). It is the ALJ's responsibility to determine a claimant's residual functional capacity based on all of the relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own description of her limitations. Jones v. Astrue, 619 F.3d 963, 971 (8th Cir. 2010) (citing Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007)).

In addition to considering the medical treatment records, plaintiff's work history, her activities of daily living, and her testimony, the ALJ gave weight to the September 2011 opinion of the non-examining psychologist, Dr. Hutson, who found that plaintiff was only moderately limited in maintaining concentration and a work schedule, interacting socially, and adapting to change. He found that plaintiff could understand and remember instructions and work procedures, make work decisions, and act appropriately in a setting with few social demands. The ALJ explained he gave Dr. Hutson's opinion weight because it was consistent with the overall record. State agency medical and psychological consultants are highly qualified physicians whose expert opinions "cannot be ignored by ALJs or the Appeals Council." Toland v. Colvin, 761 F.3d 931, 937 (8th Cir. 2014).

Plaintiff argues that the ALJ should have further developed the record by obtaining an opinion from a treating physician or a consultative exam. However, it was plaintiff's responsibility in the first instance to provide the medical evidence needed to establish disability. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993); 20 C.F.R. §§ 404.1512 and 416.912. The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled. Combs v. Astrue, 243 Fed. Appx. 200, 205 (8th Cir. 2007) (citing Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994); 20 C.F.R. §§ 404.1519a(b) and 416.919a(b) (2006)).

Here plaintiff's medical records include mental health treatment records from March 2010 through August 2012 -- approximately 2 1/2 years. In addition, the ALJ had the opinion of a consultative psychologist and plaintiff's own testimony. The evidence in the record was sufficient from which to make a determination regarding plaintiff's residual functional capacity, and the ALJ did not err in failing to order a consultative examination.

## VIII.   HYPOTHETICAL

Plaintiff argues that the ALJ erred in relying on a hypothetical that did not accurately portray all of plaintiff's limitations.  "Plaintiff's counsel posed the most accurate hypothetical, wherein the hypothetical individual would need to take unscheduled breaks because of breakdowns, becoming emotional, and becoming teary eyed.  To this hypothetical, the expert witness stated that such a person could not perform any job."

A hypothetical is sufficient if it includes the impairments supported by substantial evidence and found credible by the ALJ.  Blackburn v. Colvin, 761 F.3d 853, 860-861 (8th Cir. 2014); Smith v. Colvin, 756 F.3d 621, 627 (8th Cir. 2014); Turpin v. Colvin, 750 F.3d 989, 993 (8th Cir. 2014).  As discussed at length above, the ALJ properly found that plaintiff is not required by her impairments to take unscheduled breaks due to breakdowns, becoming emotional, or becoming teary eyed.  In fact, plaintiff never testified that she has to take unscheduled breaks, that she has breakdowns at work, or that she becomes teary eyed, other than when her boss would reprimand her.  She never made those allegations in any of her disability paperwork. The only place breakdowns and unscheduled breaks appear in this record is in plaintiff's counsel's question to the vocational expert.

In this case, the hypothetical relied on by the ALJ included all of the limitations he found credible.

## VIII.   CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

Case 2:13-cv-04241-REL   Document 16   Filed 12/18/14   Page 38 of 39

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen

ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
December 17, 2014